TELE TECH OF CONNECTICUT CORPORATION *v.*
DEPARTMENT OF PUBLIC UTILITY
CONTROL ET AL.
(SC 17105)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued February 18—officially released August 31, 2004

*Robert L. Marconi*, assistant attorney general, for the appellant (named defendant).

*Thomas W. Bucci*, for the appellee (plaintiff).

*William L. Valle, Jr.*, with whom, on the brief, was *Mary J. Healey*, for the appellee (defendant office of consumer counsel).

*Opinion*

ZARELLA, J. This appeal requires us to determine whether the named defendant,[1] the department of public utility control (department), provided Tele Tech of Connecticut Corporation (Tele Tech), prior to the institution of license revocation proceedings, with proper notice and an opportunity to show compliance with all legal requirements for the retention of a license pursuant to General Statutes § 4-182 (c).[2] We conclude that

---

[1] Pursuant to General Statutes § 16-2a (a), the office of consumer counsel appeared as a codefendant in the administrative appeal of the plaintiff, Tele Tech of Connecticut Corporation (Tele Tech), on behalf of residential and business consumers of telecommunications services in Connecticut. General Statutes § 16-2a (a) authorizes the office of consumer counsel "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the Department of Public Utility Control and shall participate in such proceedings to the extent it deems necessary." The office of consumer counsel has participated in all prior department of public utility control proceedings involving Tele Tech.

[2] General Statutes § 4-182 provides: "(a) When the grant, denial or renewal of a license is required to be preceded by notice and opportunity for hearing, the provisions of this chapter concerning contested cases apply.

"(b) When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license shall not expire until the application has been finally determined by the agency, and, in case the application is denied or the terms of the new license limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.

it did not. Because Tele Tech has failed to demonstrate that its substantial rights were prejudiced, however, we reverse the judgment of the trial court.

We first set forth the facts relevant to this case. In December, 1997, Tele Tech applied for, and was granted, a certificate of public convenience and necessity for the operation of pay telephone services in Connecticut[3] pursuant to General Statutes § 16-247g (a).[4]

"(c) No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined.

"(d) (1) When an agency is authorized under the general statutes to issue a license, but is not specifically authorized to revoke or suspend such license, the agency may: (A) Revoke or suspend such license in accordance with the provisions of subsection (c) of this section; or (B) (i) adopt regulations, in accordance with the provisions of chapter 54, that provide a procedure for the revocation or suspension of such license consistent with the requirements of said subsection (c), and (ii) revoke or suspend such license in accordance with such regulations.

"(2) Nothing in this subsection shall be construed to affect (A) the validity of any regulation adopted in accordance with this chapter and effective on or before October 1, 1999, or (B) any contested case in which a notice under section 4-177 is issued on or before October 1, 1999."

[3] We note that, in granting Tele Tech's application for a certificate of public convenience and necessity, the department ordered Tele Tech to post a 10 percent surety bond based on $1000 per active pay telephone not later than fifteen days "prior to its offering of service in Connecticut," as the department does with all other certified pay telephone service providers.

[4] General Statutes § 16-247g (a) provides: "(1) Any person may apply to the department for an initial certificate of public convenience and necessity to offer and provide intrastate telecommunications services. Such application shall include such information as the department shall require, and any reasonable fees, not to exceed actual cost, the department may prescribe, in regulations adopted pursuant to chapter 54. The department may issue such certificate and may, as a precondition to certification, require any applicant to procure a performance bond sufficient to cover moneys due or to become due to other telecommunications companies for the provision

Subsequently, in response to numerous consumer complaints, the department initiated an investigation of Tele Tech's "managerial, financial, and technical ability . . . to operate as a provider of customer owned coin operated telephone . . . service in Connecticut." In a decision issued on November 8, 2000, the department concluded that "Tele Tech [was] suitable to continue providing [customer owned coin operated telephone] service in Connecticut . . . [but that Tele Tech was] liable for fines pursuant to [General Statutes] § 16-41 (a)[5] . . . for its unresponsiveness to Department letters, its lack of financial responsibility to its customers, and its ineffective management." The department also

---

of access to local telecommunications networks, to protect any advances or deposits it may collect from its customers if the department does not order that such advances or deposits be held in escrow or trust, and to otherwise protect customers. Following receipt of such application, the department shall give notice of such application to all interested persons. The department may approve or deny the application after holding a hearing with notice to all interested persons if any person requests such hearing."

[5] General Statutes § 16-41 (a) provides in relevant part: "Each (1) public service company and its officers, agents and employees . . . (3) certified telecommunications provider or person providing telecommunications services without authorization pursuant to sections 16-247f to 16-247h, inclusive, and its officers, agents and employees . . . shall obey, observe and comply with all applicable provisions of this title and each applicable order made or applicable regulations adopted by the Department of Public Utility Control by virtue of this title so long as the same remains in force. Any such company . . . certified telecommunications provider, person, any officer, agent or employee thereof . . . which the department finds has failed to obey or comply with any such provision of this title, order or regulation shall be fined by order of the department in accordance with the penalty prescribed for the violated provision of this title or, if no penalty is prescribed, not more than ten thousand dollars for each offense except that the penalty shall be a fine of not more than forty thousand dollars for failure to comply with an order of the department made in accordance with the provisions of section 16-19 or 16-247k or within thirty days of such order or within any specific time period for compliance specified in such order. Each distinct violation of any such provision of this title, order or regulation shall be a separate offense and, in case of a continued violation, each day thereof shall be deemed a separate offense. Each such penalty and any interest charged pursuant to subsection (g) or (h) of section 16-49 shall be excluded from operating expenses for purposes of rate-making."

stated in its decision that, "[a]t this time, the Department will not revoke [Tele Tech's] Certificate of Public Convenience and Necessity" but admonished that "Tele Tech must realize that its failure to properly respond to the Department and its customers in the future will result in [the] revocation of its [certificate of public convenience and necessity]." In accordance with its November 8, 2000 decision, the department ordered Tele Tech to pay a $20,000 fine.

Tele Tech requested a hearing before the department to determine the propriety of the department's assessment of the $20,000 fine pursuant to § 16-41. After a hearing on this matter, the department issued a decision on June 13, 2001, "reaffirm[ing] its November 8, 2000 [d]ecision that the fine [was] appropriate and . . . in accordance with . . . [§§ 16-247g] and . . . 16-41." The department set a payment due date of June 29, 2001, but Tele Tech did not pay the fine.

Subsequently, upon learning that Tele Tech had failed to pay the fine, the department initiated another investigation of Tele Tech. In an August 17, 2001 letter to Tele Tech, the department advised Tele Tech that, pursuant to § 16-247g, it was initiating an investigation into whether it should revoke Tele Tech's certificate of public convenience and necessity. The department noted in this letter that it designated Tele Tech "as a party to this proceeding."[6] Although the department informed

---

[6] The text of the August 17, 2001 letter provides in relevant part: "Please be advised that the Department of Public Utility Control (Department) has initiated the above referenced docket, pursuant to [§] 16-247g . . . . Additional information is available at the Department's website . . . regarding the procedural practices of the Department and subsequent filings to the Department. The Department hereby designates Tele Tech . . . as a party to this proceeding. The Department will be contacting you regarding further processing of this docket.

"Please be advised that the Department strictly observes [General Statutes] § 4-181 which prohibits ex parte communication during a contested case. There may be no communication, direct or indirect, with Commissioners or Department staff assigned to assist the Commissioners on any issue of fact or law pertaining to this matter unless that communication takes

Tele Tech of such matters as the statutory prohibition on ex parte communications in a contested case and Tele Tech's duties pertaining to the submission of briefs and written exceptions to draft decisions, it did not articulate the factual basis underlying the initiation of the new investigation.

In response to the department's August 17, 2001 letter, Tele Tech requested clarification of the basis for the department's investigation in a letter dated September 6, 2001. The department responded, in a letter dated September 17, 2001, that the latest investigation was initiated because "Tele Tech ha[d] failed to pay the $20,000 fine that was ordered in [June, 2001]," and because the department "also [had] received a Notice of Cancellation on July 27, 2001, from Utica Mutual Insurance Company [Utica Mutual] for Tele Tech's

place in the course of a noticed hearing or meeting, or is made in writing with copies supplied to all other designated participants. Communication with the Department's coordinator regarding scheduling is not ex parte and is permitted. The normal discourse that takes place between parties is permitted.

"Pursuant to [General Statutes] § 16-2a, the Office of Consumer Counsel . . . has been designated a party to this proceeding. The Department hereby directs Parties and Intervenors to provide two . . . copies of all material submitted in this docket directly to the [Office of Consumer Counsel]. These copies are in addition to those required by the Department and should be addressed to [the Office of Consumer Counsel], not the Department.

"The Department requires that an original and six . . . copies of all submissions, including cover letters, be filed with the Executive Secretary of the Department by [4 p.m.], on or before any required date. For all briefs, reply briefs and comments/written exceptions to draft Decisions, the Department requires an original and nine . . . copies. This is in addition to any copies given directly to Commissioners, staff or other parties and intervenors. . . .

"An electronically formatted copy of all material submitted in this docket shall also be provided to the Department. . . .

"All Parties and Intervenors are required to serve each other with a copy of all documents submitted to this Department and the [Office of Consumer Counsel]. The current service list for this docket is enclosed. The service list will be updated as others are admitted for service in this proceeding. . . ."

surety bond."[7] According to the department, the notice of cancellation indicated that the surety bond that Utica Mutual had issued would have been cancelled on August 27, 2001, on the basis of Tele Tech's nonpayment of premiums. The department explained that, on the basis of the foregoing information, "Tele Tech's financial and managerial capability [was] called into question."

The department scheduled a hearing for December 18, 2001. Tele Tech, however, requested and received a continuance due to a scheduling conflict. Subsequently, on January 15, 2002, the hearing proceeded,[8] and, thereafter, on March 12, 2002, the department issued a draft decision reflecting its initial determination to revoke Tele Tech's certificate of public convenience and necessity.[9] Tele Tech took exception to the department's draft decision and submitted written exceptions in which it claimed, inter alia, that "[t]he [department's] decision result[ed] from a process that

[7] The department noted in its September 17, 2001 letter that the bond was required under the provisions of "§ 16-247g and the Department's August 27, 1997 Decision in Docket No. 94-07-05, [Department] Investigation Into Competitive Provision of [C]ustomer Owned Coin Operated Telephone Service . . . In Connecticut—Reopening."

[8] At the hearing, Carlos de la Torres, testified for Tele Tech. With respect to the cancelled surety bond, about which the department had informed Tele Tech in its September 17, 2001 letter, the hearing examiner asked de la Torres, "[W]hat caused the delay in [Tele Tech's] requesting the reinstatement" when Tele Tech had been made aware of the cancellation in September, 2001, yet had not requested reinstatement of the bond until January 14, 2002? He responded, "Actually, negligence." When asked about Tele Tech's failure to pay the $20,000 fine that the department imposed, de la Torres testified that Tele Tech did not have the funds to pay it, but that, although Tele Tech was unaware that it could have requested a payment plan, Tele Tech would have paid the fine if such a plan had been implemented.

[9] In its draft decision, the department noted that the "draft Decision is being distributed to the parties in this proceeding for comment. The proposed Decision is not a final Decision of the Department. The Department will consider the parties' arguments and exceptions before reaching a final Decision. The final Decision may differ from the proposed Decision. Therefore, this draft Decision does not establish any precedent and does not necessarily represent the Department's final conclusion."

is constitutionally and statutorily flawed in that Tele Tech's due process rights were violated by the [department]." On May 1, 2002, the department issued its final decision, in which it expressly rejected Tele Tech's exceptions and approved the revocation of Tele Tech's certificate of public convenience and necessity.

Tele Tech appealed from the department's adverse decision to the Superior Court, which sustained the appeal and remanded the case to the department with direction to afford Tele Tech a compliance hearing within thirty days. The department appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We will set forth additional facts as needed.

Our standard of review of administrative agency rulings is well established. E.g., *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 520, 560 A.2d 403 (1989). "Judicial review of an administrative decision is a creature of statute"; (internal quotation marks omitted) *PARCC, Inc.* v. *Commission on Hospitals & Health Care*, 235 Conn. 128, 138, 663 A.2d 992 (1995); and "[General Statutes § 4-183 (j)] permits modification or reversal of an agency's decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error or law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Internal quotation marks omitted.) *Levinson* v. *Board of Chiropractic Examiners*, supra, 520–21; accord General Statutes § 4-183 (j). We have stated that "not all procedural irregularities

require a reviewing court to set aside an administrative decision . . . ." (Internal quotation marks omitted.) *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 97, 596 A.2d 374 (1991). The complaining party has the burden of demonstrating that its substantial rights were prejudiced by the error. See id.; *Levinson* v. *Board of Chiropractic Examiners*, supra, 536.

In addition, although we have noted that "[a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts"; (internal quotation marks omitted) *Secretary of the Office of Policy & Management* v. *Employees' Review Board*, 267 Conn. 255, 262, 837 A.2d 770 (2004); we have maintained that "[c]ases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) Id. Thus, "[w]e have determined . . . that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) Id.

I

We first address Tele Tech's claim that the department lacked jurisdiction to revoke Tele Tech's certificate of public convenience and necessity because the department allegedly had failed to comport with the provisions of § 4-182 (c) in not giving Tele Tech notice and an opportunity to show compliance. Tele Tech contends that "[t]he [department's] failure to minimally comply with the requirements of . . . § 4-182 (c) deprived it of jurisdiction to revoke [Tele Tech's certificate of public convenience and necessity]." According

to Tele Tech, "[t]he statutory requirements of § 4-182 (c) are a necessary precondition to formal licensure revocation proceedings." Tele Tech thus implicitly equates a revocation that is not in compliance with § 4-182 (c) with a revocation that has occurred without jurisdiction. We are not persuaded.

We agree with Tele Tech that administrative agencies possess limited jurisdiction. E.g., *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, 261 Conn. 1, 21, 803 A.2d 879 (2002). As we have stated, "[t]he principles of subject matter jurisdiction are well established. Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . It is a familiar principle that a court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation. . . .

"This concept, however, is not limited to courts. Administrative agencies [such as the department] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions . . . under which it acquires authority unless the statutes expressly grant it that power." (Citation omitted; internal quotation marks omitted.) Id., 21–22; accord *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996); see also *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 156, 788 A.2d 1158 (2002).

In addition, we often have recognized a distinction between "subject matter jurisdiction" and the proper exercise of "authority to act under a particular statute." *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, supra, 261 Conn. 3 n.2. "Although related, the court's authority to act pursuant to a statute is different from its subject matter jurisdiction. The power of the court to hear and determine, which is implicit in jurisdiction, is not to be confused with the way in which that power must be exercised in order to comply with the terms of the statute." (Internal quotation marks omitted.) Id.; cf. *Cantoni* v. *Xerox Corp.*, 251 Conn. 153, 162, 740 A.2d 796 (1999). Whereas "[s]ubject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it"; (internal quotation marks omitted) *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, supra, 3 n.2; the authority to act refers to "the way in which that power [to hear and to determine the controversy] must be exercised in order to comply with the terms of the statute." (Internal quotation marks omitted.) Id.; accord *Bailey* v. *Mars*, 138 Conn. 593, 601, 87 A.2d 388 (1952). We have maintained that "[a] court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it"; *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, supra, 3 n.2; and, "[o]nce it is determined that a tribunal has authority or competence to decide the class of cases to which the action belongs, the issue of subject matter jurisdiction is resolved in favor of entertaining the action." (Internal quotation marks omitted.) *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 443, 797 A.2d 1081 (2002).

Jurisdiction thus is the "power . . . to hear and determine cases"; *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, supra, 261 Conn.

21; and, in the present case, § 16-247g (g)[10] provides the department with the power to revoke a certificate of public convenience and necessity. General Statutes § 16-247g (g) provides in relevant part that the department, under certain circumstances, "may suspend or revoke the authorization to provide said telecommunications service or take any other action it deems appropriate. . . ." Section 4-182 (c) of the Uniform Administrative Procedure Act (UAPA), on the other hand, does not vest the department with authority to revoke a certificate of public convenience and necessity but, instead, declares that "[n]o revocation . . . of any license is *lawful* unless" the agency follows certain procedures. (Emphasis added.) General Statutes § 4-182 (c). Thus, the mere fact that the procedures employed by the department in revoking a license do

---

[10] General Statutes § 16-247g (g) provides: "Notwithstanding any decision of the department to allow the competitive provision of a telecommunications service or to grant a certificate pursuant to this section, the department, after holding a hearing with notice to all interested parties and determining that (1) continued competitive provision of a telecommunications service would be contrary to the goals set forth in section 16-247a, or would not be in accordance with the provisions of sections 16-247a to 16-247c, inclusive, section 16-247e or 16-247f, this section, or section 16-247h, or 16-247k, (2) a certified telecommunications provider does not have adequate financial resources, managerial ability or technical competency to provide the service, or (3) a certified telecommunications provider has failed to comply with an applicable order made or regulation adopted by the department, may suspend or revoke the authorization to provide said telecommunications service or take any other action it deems appropriate. In determining whether to suspend or revoke such authorization, the department shall consider, without limitation, (A) the effect of such suspension or revocation on the customers of the telecommunications service, (B) the technical feasibility of suspending or revoking the authorized usage only on an intrastate basis, and (C) the financial impact of such suspension or revocation on the provider of the telecommunications service."

Thus, in addition to being governed by the procedures set forth in § 4-182 (c) of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., the department also is governed by the provisions of § 16-247g (g). See *PARCC, Inc.* v. *Commission on Hospitals & Health Care*, supra, 235 Conn. 139 (commission on hospitals and health care was governed by UAPA as well as other statutory provisions).

not satisfy the requirements of § 4-182 (c) does not mean that the department lacks jurisdiction to revoke the license, as the department's power to revoke emanates from § 16-247g (g). Therefore, it cannot be said that the department acted without jurisdiction merely because it failed to comply with § 4-182 (c); instead, any failure to comply with § 4-182 (c) suggests that the department, in exercising its proper jurisdiction, failed to abide by the dictates of the law. See, e.g., *Terry's Appeal from Probate*, 67 Conn. 181, 185, 34 A. 1032 (1896) ("in exercising its jurisdiction [the court] must obey the law, or its determination will be at least erroneous").

Moreover, the cases on which Tele Tech relies do not strengthen its claim that an agency's failure to comply with § 4-182 (c) deprives the agency of jurisdiction. Rather, those cases support our conclusion that the failure of an agency to comply with the provisions of § 4-182 (c) renders the agency's action unlawful. See *Blackwell College of Business* v. *Attorney General*, 454 F.2d 928, 933–35 (D.C. Cir. 1971); *Valley View Convalescent Home* v. *Dept. of Social & Health Services*, 24 Wash. App. 192, 199–200, 599 P.2d 1313 (1979), review denied, 93 Wash. 2d 1004 (1980). In the two cases on which Tele Tech relies, each court determined that the agency had failed to comply with the provision of the applicable administrative procedure act requiring notice and an opportunity to show compliance prior to the institution of agency proceedings, and, therefore, that the agency had acted unlawfully. See *Blackwell College of Business* v. *Attorney General*, supra, 933, 935 (noting that 5 U.S.C. § 558 [c][11] of federal Administrative

---

[11] Section 558 (c) of title 5 of the United States Code provides in relevant part: "When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public

Procedure Act provides that " 'revocation . . . of a license is lawful only if' " agency follows outlined procedures, and concluding that agency's action fell "short of meeting the requirements of due process of law"); *Valley View Convalescent Home* v. *Dept. of Social & Health Services*, supra, 200 ("[b]y not granting the licensee a reasonable amount of time to comply [in accordance with the applicable provision of the state administrative procedure act], the procedure the [agency] invoked was . . . unlawful . . . and the proceeding must be dismissed"). In neither case did the court hold that a violation of the applicable administrative procedure act deprived the agency of jurisdiction to revoke the license. Accordingly, Tele Tech's contention that the department's noncompliance with the provisions of § 4-182 (c) deprived the department of jurisdiction is without merit.

## II

Having resolved Tele Tech's jurisdictional claim, we now turn to the merits of the claims of the department and the defendant office of consumer counsel[12] in this appeal. The department and the office of consumer counsel claim that the trial court improperly concluded that the department had failed to comply with § 4-182 (c) by not providing Tele Tech, prior to the institution of agency proceedings, with adequate notice and an opportunity to show compliance with the applicable legal requirements for the retention of its certificate of public convenience and necessity.[13] We do not agree.

---

health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

"(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

"(2) opportunity to demonstrate or achieve compliance with all lawful requirements. . . ." 5 U.S.C. § 558 (c) (2000).

[12] See footnote 1 of this opinion.

[13] The department also claims that Tele Tech failed to raise its statutory and constitutional challenges regarding the insufficient opportunity to show

In its memorandum of decision, the trial court found that "[Tele Tech] should have been afforded an opportunity to demonstrate compliance with all lawful requirements as a condition precedent to a license revocation hearing under . . . § 4-182 (c)."[14] Accordingly, the trial court sustained Tele Tech's appeal and remanded the matter to the department with direction to "afford [Tele Tech] a compliance hearing within thirty days . . . ."

Thereafter, the department moved for an articulation of the trial court's decision. The trial court responded to the motion by articulating that, "[o]ut of an excess of caution and because [§] 4-182 (c) affords the licensee the opportunity to comply as a condition precedent to revocation, this court ordered the [department] to provide [Tele Tech with] an opportunity to show compliance as it relates to this action. The [department] has never claimed an emergency so an additional thirty days was not prejudicial to actions involving [Tele Tech] that ha[ve] lingered so long." As a result, the trial court's

compliance in the department proceedings and, therefore, waived these challenges for purposes of this appeal. The department's claim is without merit, however, as the record reveals that Tele Tech raised these challenges in its March 19, 2002 statement of exceptions to the department's March 12, 2002 draft decision. In its statement of exceptions, Tele Tech challenged the department's draft decision, claiming that it "result[ed] from a process that is constitutionally and statutorily flawed in that Tele Tech's due process rights were violated by the [department]," and that "[t]he [August 17, 2001] letter did not identify the reasons for the initiation of such action by the [department] or [the] nature of the charges that led to this action." Furthermore, the department responded to Tele Tech's statement of exceptions and addressed Tele Tech's challenges in its final decision of May 1, 2002. In its final decision, the department stated: "In its brief and at oral argument, [Tele Tech] maintains that the department's notice to show cause in the instant proceeding lacked sufficient specificity to satisfy the due process rights fundamentally guaranteed to it in the United States constitution and . . . [under UAPA]." Thus, contrary to the department's claim, Tele Tech did not waive its right to raises these challenges in the present appeal.

[14] The trial court also noted that "[t]here [was] no claim that the department . . . found that the public health, safety or welfare imperatively require[d] an emergency action that summary suspension of [Tele Tech's] license [was] required."

order that the department conduct a compliance hearing remained in effect.

The procedures that an administrative agency must follow for the lawful revocation of a license[15] pursuant to UAPA are set forth in subsection (c) of § 4-182. General Statutes § 4-182 (c) provides in relevant part: "No revocation . . . of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. . . ."[16]

---

[15] We note that Tele Tech's certificate of public convenience and necessity to operate pay telephone services in Connecticut qualifies as a "license" within the meaning of UAPA. General Statutes § 4-166 (6) defines a "license" as including "the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law, but does not include a license required solely for revenue purposes . . . ." "We have construed th[e] language of [§ 4-166 (6)] broadly to include any required agency permission even if it is not specifically called a license." (Internal quotation marks omitted.) *PARCC, Inc.* v. *Commission on Hospitals & Health Care,* supra, 235 Conn. 140. Because Tele Tech was required to obtain permission from the department in order to offer its pay telephone services in Connecticut; see General Statutes § 16-247g (a) (1) ("[a]ny person may apply to the department for an initial certificate of public convenience and necessity to offer and provide intrastate telecommunications services"); we conclude that Tele Tech's certificate of public convenience and necessity constituted a license within the meaning of UAPA.

[16] We reject the department's contention that "the phrase, 'prior to the institution of agency proceedings' [in § 4-182 (c)], applies to the phrase regarding notice, [but] not to the phrase concerning compliance . . . ." The plain language and organization of the sentence reflects that the clause, "prior to the institution of agency proceedings," applies to both the notice requirement and the requirement that the licensee be afforded an opportunity to show compliance. See General Statutes § 4-182 (c); see also *Anchustegui* v. *Dept. of Agriculture,* 257 F.3d 1124, 1129 (9th Cir. 2001) (noting that analogous provision of federal Administrative Procedure Act, namely, 5 U.S.C. § 558 [c], "requires written notice and an opportunity to demonstrate or achieve compliance, all 'before the institution of agency proceedings' " [emphasis added]).

The department claims that the plain meaning of the term "proceedings," as used in § 4-182 (c), does not encompass the initiation of the investigation against Tele Tech in August, 2001; rather, "by implication, the term 'proceeding' means the agency hearing" that occurred on January 15, 2002. Alternatively, the office of consumer counsel contends that "the use of the word 'proceeding' in [§ 4-182 (c)] most logically refers to the final decision," that is, the department's final decision to revoke Tele Tech's certificate of public convenience and necessity, which was rendered on May 1, 2002. Under either construction, therefore, the department and the office of consumer counsel claim that the department provided Tele Tech with adequate notice and an opportunity to show compliance with the statutory requirements when it issued the September 17, 2001 letter to Tele Tech prior to the institution of the "proceedings" against it. We disagree.

A

In order to resolve the claims of the department and the office of consumer counsel, we must construe the meaning of the phrase, "institution of agency proceedings" as used in § 4-182 (c). More specifically, we must determine whether the term "proceedings" means the agency "hearing" or "final decision," as the department and the office of consumer counsel respectively contend, or whether it has a broader meaning.

When construing a statute, we first look to its text, as directed by Public Acts 2003, No. 03-154, § 1 (P.A. 03-154). Public Act 03-154, § 1, provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or

unworkable results, extratextual evidence of the meaning of the statute shall not be considered."[17]

UAPA does not expressly define the term "proceedings." As we often have observed, however, "[w]hen construing a statute, we may look for guidance to other statutes relating to the same general subject matter, as the legislature is presumed to have created a consistent body of law." *Cagiva North America, Inc.* v. *Schenk,* 239 Conn. 1, 12, 680 A.2d 964 (1996); see also P.A. 03-154, § 1 ("[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes"); *Petco Insulation Co.* v. *Crystal,* 231 Conn. 315, 323–24, 649 A.2d 790 (1994) ("[i]t is settled that statutes must be construed consistently with other relevant statutes because the legislature is presumed to have created a coherent body of law").

With this principle in mind, we conclude that the statutory scheme strongly suggests that the term "proceedings," and the terms "hearing" and "final decision," as used in other related statutory provisions in UAPA, namely, General Statutes §§ 4-176e[18] and 4-179 (a),[19]

---

[17] The legislature enacted P.A. 03-154, § 1, in direct response to our decision in *State* v. *Courchesne,* 262 Conn. 537, 816 A.2d 562 (2003), and we have recognized that P.A. 03-154, § 1, "has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury,* 266 Conn. 706, 716 n.10, 835 A.2d 33 (2003).

[18] General Statutes § 4-176e provides: "Except as otherwise required by the general statutes, a hearing in an agency proceeding may be held before (1) one or more hearing officers, provided no individual who has personally carried out the function of an investigator in a contested case may serve as a hearing officer in that case, or (2) one or more of the members of the agency."

[19] General Statutes § 4-179 (a) provides: "When, in an agency proceeding, a majority of the members of the agency who are to render the final decision have not heard the matter or read the record, the decision, if adverse to a party, shall not be rendered until a proposed final decision is served upon the parties, and an opportunity is afforded to each party adversely affected

denote different events. We begin with an examination of § 4-176e, which governs agency hearings. General Statutes § 4-176e provides that "a *hearing* in an agency *proceeding* may be held before" certain hearing officers or members of the agency. (Emphasis added.) General Statutes § 4-179 (a) similarly reflects a distinction between "proceeding" and "final decision," as it provides that, "[w]hen, in an agency *proceeding*, a majority of the members of the agency who are to render the *final decision* have not heard the matter or read the record, the decision, if adverse to a party, shall not be rendered until a proposed final decision is served upon the parties . . . ." (Emphasis added.) It is evident from the use of these terms in §§ 4-176e and 4-179 (a), respectively, that the legislature has recognized a distinction between a "proceeding," on the one hand, and a "hearing" or a "final decision," on the other hand. If the legislature had intended the term "proceedings" in § 4-182 (c) to mean a "hearing" or a "final decision," it would not have distinguished between those terms in the foregoing statutory provisions.

Furthermore, when a statute does not define a term, such as the term "proceedings" in § 4-182 (c), "[w]e . . . look to the common understanding of the term as expressed in the dictionary." *Bock & Clark Corp.* v. *Dept. of Consumer Protection*, 265 Conn. 400, 411, 828 A.2d 601 (2003); see also General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"); *Secretary of the Office of Policy & Management* v. *Employees' Review Board*, supra, 267 Conn. 265 ("[i]n the absence of a statutory definition, words and phrases in a statute are to be construed according to their common usage"). Webster's Third New International Dictionary defines a "proceeding" as

to file exceptions and present briefs and oral argument to the members of the agency who are to render the final decision."

"a particular action at law or case in litigation . . . ." A "hearing," on the other hand, encompasses something narrower and more specific, namely, "a session . . . in which witnesses are heard and testimony is taken" or an "opportunity to be heard or to present one's side of a case"; Webster's Third New International Dictionary; as does a "final decision," which General Statutes § 4-166 (3) (A) defines as "the agency determination in a contested case . . . ." Although the department maintains that "agency proceedings," as used in § 4-182 (c), means "agency hearings," and the office of consumer counsel claims that the term means the "agency's final decision," the definitions of these terms suggest that they are not analogous and that a proceeding encompasses a broader category of events than that encompassed by a hearing or a final decision. We therefore reject any claim that, for purposes of § 4-182 (c), the department initiated proceedings at the time of the department's January 15, 2002 hearing or when the department rendered its final decision on May 1, 2002. We conclude that the department instituted the proceedings against Tele Tech when it issued the August 17, 2001 letter to Tele Tech informing it of its initiation of the new investigation.

The department nonetheless claims that a literal reading of § 4-182 (c) would lead to absurd results. The department argues that, if the initiation of the "proceeding" occurs "the moment the agency opens a file or docket with an eye [toward] the possible revocation of a license, then a license could never be revoked or suspended . . . [because] the agency always has initiated a proceeding without first informing the licensee of the specific facts supporting such an action." Thus, the department argues that it would be impossible to issue a warning letter to a licensee without already having initiated proceedings against the licensee. We do not understand why a warning letter with notice of

the problems that might lead to the revocation of Tele Tech's certificate of public convenience and necessity and an opportunity to show compliance or to cure those problems that have resulted in noncompliance could not be sent prior to the commencement of formal revocation proceedings. We therefore reject the department's claim that a plain reading of § 4-182 (c) would yield absurd results.

B

Having determined that the department instituted agency proceedings against Tele Tech on August 17, 2001, we next address whether the trial court properly concluded that the department did not provide, prior to the institution of these proceedings, "notice . . . of [the] facts or conduct" deemed to be improper and "an opportunity to show compliance with all lawful requirements for the retention of the license." General Statutes § 4-182 (c). We conclude that the trial court properly determined that the department did not satisfy either of these requirements.

The department's August 17, 2001 letter did not satisfy the requirements of § 4-182 (c) because the letter commenced the revocation proceedings and, thus, could not have provided Tele Tech with notice and an opportunity to show compliance "prior to the institution of . . . [the proceeding] . . . ."[20] General Statutes § 4-

---

[20] Although the August 17, 2001 letter itself does not so indicate, it appears to have been sent to Tele Tech pursuant to the requirement of General Statutes § 4-177 that all parties to a contested case be notified of the opportunity for a hearing. General Statutes § 4-177 provides in relevant part: "(a) In a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.

"(b) The notice shall be in writing and shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; and (4) a short and plain statement of the matters asserted. . . ."

182 (c). The August 17, 2001 letter[21] merely advised Tele Tech that the department had initiated an investigation into whether it should revoke Tele Tech's certificate of public convenience and necessity, informed Tele Tech of certain departmental procedural practices and indicated that it had designated Tele Tech as a party to the proceeding without reference to the basis underlying the initiation of the proceeding.[22]

The office of consumer counsel nevertheless contends that "it is clear that the grounds [for the initiation of the new investigation in August, 2001] were self-evident," and that that investigation "was in fact simply the next logical phase of a continuing investigation, one replete with repeated references to the underlying problems created by Tele Tech's service and regulatory failures." We disagree.

The grounds for revocation of a license must be more than *self-evident*. Section § 4-182 (c) requires an agency to give a licensee, prior to the institution of agency proceedings, written notice of conduct warranting the revocation of its license and an opportunity to show compliance with all of the legal requirements for the retention of the license. The department failed to satisfy these requirements under the facts of the present case. Indeed, the record reveals that, because Tele Tech did

[21] See footnote 6 of this opinion for the text of the August 17, 2001 letter.

[22] We reject the claims of the department and the office of consumer counsel that the department's September 17, 2001 letter, which set forth the basis underlying the department's initiation of the investigation, constituted adequate notice within the meaning of § 4-182 (c). Although the September 17, 2001 letter set forth the factual basis for the department's initiation of the investigation, the department had not issued the September 17, 2001 letter "prior to the institution of agency proceedings"; General Statutes § 4-182 (c); on August 17, 2001, as required by § 4-182 (c). Thus, by the time that the department issued its September 17, 2001 letter, the proceeding against Tele Tech already had been initiated. The September 17, 2001 letter, therefore, could not have constituted adequate notice, prior to the institution of agency proceedings, pursuant to § 4-182 (c), and, accordingly, this claim fails.

not understand the factual basis for the department's initiation of the investigation against Tele Tech on August 17, 2001, it requested clarification in its September 6, 2001 letter to the department. Furthermore, this is not a situation in which numerous letters from the department, warning the licensee of deficiencies in its conduct, would satisfy the provisions of § 4-182 (c). Under § 4-182 (c), the licensee also must be afforded an opportunity to show compliance with the legal requirements for the retention of its license.

Even though the department previously had warned Tele Tech, in its November 8, 2000 decision, that its noncompliance with that decision would result in the future revocation of its certificate of public convenience and necessity and that Tele Tech was required to maintain a surety bond in order to retain the certificate, the department was obliged to follow the procedures set forth in § 4-182 (c) in its subsequent revocation proceeding. The department can neither evade nor discharge its duty of providing Tele Tech with proper notice and an opportunity to show compliance by claiming that it notified Tele Tech of its "intended action" during a previous proceeding that already had been concluded. We note further that, to accept the department's warning in an earlier proceeding as sufficient notice in a subsequent proceeding would set a dangerous precedent because it would encourage other agencies to claim proper notice of any issue discussed in a prior decision that had been released months or even years in advance of the subsequent, and entirely separate, proceeding. Section 4-182 (c) neither provides for, nor contemplates, such a result.

We believe that the "opportunity to show compliance" provision represents a "second chance" doctrine, which allows a licensee the opportunity to "put its house in lawful order before more formal agency proceedings are undertaken." *Gallagher & Ascher Co.* v.

*Simon,* 687 F.2d 1067, 1074 (7th Cir. 1982), citing *Blackwell College of Business* v. *Attorney General,* supra, 454 F.2d 933–34; see also *George Steinberg & Son, Inc.* v. *Butz,* 491 F.2d 988, 993–94 (2d Cir.), cert. denied, 419 U.S. 830, 95 S. Ct. 53, 42 L. Ed. 2d 55 (1974). Carlos de la Torres, who testified on behalf of Tele Tech during the January 15, 2002 hearing, stated that, if Tele Tech had known that a payment plan could have been implemented for the $20,000 fine, Tele Tech would have agreed to such a plan. The substance of de la Torres' testimony reveals that the "second chance" doctrine was intended to cover precisely this type of situation.[23] Yet, the department's August 17, 2001 letter to Tele Tech set the revocation proceedings in motion, thereby precluding Tele Tech from attaining its statutorily granted "second chance."

## C

The department also claims that it complied with the requirements of § 4-182 (c) by providing Tele Tech with a hearing on January 15, 2002, because prior constructions of § 4-182 (c) have "suggested that the meaning of this provision was for the agency to provide a hearing before the revocation of a license" in order to satisfy the statute's requirements, rather than to provide a second chance prior to the institution of revocation proceedings. To the extent that our prior cases have suggested such a construction, we disavow such suggestions.

We have not had many occasions to construe § 4-182 (c) since its passage in 1971; see Public Acts 1971, No. 854, § 17; and we, therefore, take this opportunity to clarify the statute's scope and requirements with respect to hearings. We acknowledge that language in our earlier cases would suggest that § 4-182 (c) requires

---

[23] We do not suggest that de la Torres' testimony is or is not credible. We merely use it to demonstrate the type of situation that the "second chance" doctrine is intended to address.

a hearing or an opportunity for a hearing prior to license revocation. E.g., *PARCC, Inc.* v. *Commission on Hospitals & Health Care*, supra, 235 Conn. 142 ("[t]he defendant [commission] . . . was required by . . . UAPA to afford the plaintiff notice and *an opportunity for a hearing* before such license was *revoked*" [emphasis added]); *Easter House, Inc.* v. *Dept. of Children & Youth Services*, 214 Conn. 560, 566, 573 A.2d 304 (1990) ("[i]f the plaintiff has a license to conduct the activities that the [defendant department] letter prohibited it from engaging in . . . § 4-182 [c] entitled the plaintiff to notice and an *opportunity for a hearing* prior to such a license revocation" [emphasis added]); *Levinson* v. *Board of Chiropractic Examiners*, supra, 211 Conn. 534 (§ 4-182 [c] "requires notice and *hearing for the revocation* . . . of any license" [emphasis added]); *Hickey* v. *Commissioner of Motor Vehicles*, 170 Conn. 136, 145 n.2, 365 A.2d 403 (1976) ("[s]o that § 4-182 [c] shall be consistent with [the] provisions of the state and federal constitutions and the explication of those provisions by this court and the United States Supreme Court, the 'opportunity to show compliance' must be afforded *in the form of a hearing*, complying with other provisions of . . . UAPA as may be relevant" [emphasis added]); *Hart Twin Volvo Corp.* v. *Commissioner of Motor Vehicles*, 165 Conn. 42, 47 n.2, 327 A.2d 588 (1973) (§ 4-182 [c] "requires notice *and hearing* for the revocation . . . of any license" [emphasis added]). In *Dadiskos* v. *Connecticut Real Estate Commission*, 37 Conn. App. 777, 782–83, 657 A.2d 717 (1995), however, the Appellate Court determined that § 4-182 (c) did not require such a hearing. In order to resolve this inconsistency and the department's claim, we will review the text of § 4-182 (c), the relevant federal precedent relating to the analogous provision of the federal Administrative Procedure Act, namely, 5 U.S.C. § 558 (c),[24] and the

---

[24] See footnote 11 of this opinion. Because 5 U.S.C. § 558 (c) contains provisions similar to that of § 4-182 (c), we may look to federal precedent for guidance. E.g., *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue*

manner in which our prior cases have dealt with § 4-182 (c).

Looking first to the text of § 4-182 (c), we note that the statute contains no explicit reference to a hearing requirement, but mandates only that the agency provide "notice by mail to the licensee of facts or conduct which warrant the intended action, and . . . an opportunity to show compliance with all lawful requirements for the retention of the license." General Statutes § 4-182 (c). The lack of a hearing requirement is not unusual in a procedural statute such as § 4-182 because requirements for hearings for license revocations generally are contained in the substantive statutes dealing with licenses. See General Statutes § 16-247g (g) (authorization to provide telecommunications service may be suspended or revoked after notice to all interested parties and hearing); see also, e.g., General Statutes § 12-574 (m) (license issued by state gaming policy board may be suspended or revoked after "a reasonable opportunity for a hearing"); General Statutes § 14-100a (d) (commissioner of motor vehicles may suspend license to operate motor vehicle "after notice and an opportunity for a hearing" if licensee who violates provisions of § 14-100a fails to complete child car seat safety course);

*Services,* 231 Conn. 355, 364, 650 A.2d 147 (1994) ("[w]hen . . . the language used in the federal tax statutes is nearly identical to that before us, we may look to federal law to guide our interpretation of the state statute"); *O & G Industries, Inc.* v. *New Milford,* 229 Conn. 303, 309, 640 A.2d 110 (1994) (noting that when Connecticut legislation is "patterned after and operate[s] in general conformity with the federal statutes . . . we look to federal judicial interpretations . . . for guidance" [citations omitted; internal quotation marks omitted]); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 535, 457 A.2d 656 (1983) ("[b]ecause [the state] statute is modeled after [federal statutes], we may look to decisions under the federal law for guidance"); see also *King County* v. *Central Puget Sound Growth Management Hearings Board,* 138 Wash. 2d 161, 179, 979 P.2d 374 (1999) ("[w]here there is no [state] case law construing provisions of the [state administrative procedure act], federal precedent may serve as persuasive authority").

General Statutes § 19a-80 (b) (commissioner of public health may suspend or revoke license required to operate child day care center "after notice and an opportunity for a hearing").

Furthermore, even if a statutory scheme does not require a hearing prior to the revocation of a license, federal and state concepts of due process may require such a hearing, depending upon the nature and extent of the licensee's interest in the license. See, e.g., *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without . . . procedural due process required by the Fourteenth Amendment.").[25] Finally,

---

[25] "To formulate a claim under the [due process clause of the fourteenth amendment to the United States constitution], a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest. . . . [P]rocedural due process questions [are examined] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." (Citation omitted; internal quotation marks omitted.) *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994), quoting *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989). Moreover, "[o]nce it is determined that due process applies, the question remains what process is due. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands. [C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. . . . To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." (Citation omitted; internal quotation marks omitted.) *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

there may be instances in which a licensee's interest may be so de minimus that no revocation hearing is required. See, e.g., *Gallagher & Ascher Co.* v. *Simon*, supra, 687 F.2d 1077–79 (customs brokers not deprived of right to procedural due process when Customs Service temporarily suspended their permits without hearing because brokers' protectible property interests were not so significant as to require full adjudicatory hearing). Consequently, we do not interpret § 4-182 (c) as requiring a hearing or an opportunity for a hearing prior to the revocation of a license or as a component of the requisite "opportunity to show compliance" provision contained therein.

Our determination that § 4-182 (c) does not require a hearing is supported by the weight of federal authority relating to the analogous provision of the federal Administrative Procedure Act, namely, 5 U.S.C. § 558 (c), which likewise has been interpreted as not requiring an adjudicatory hearing. See, e.g., *West Chicago* v. *United States Nuclear Regulatory Commission*, 701 F.2d 632, 644 (7th Cir. 1983) ("[w]e now agree with the First, Fifth and Ninth [Circuit Courts of Appeals] that [5 U.S.C. §] 558 [c] does not independently provide that formal adjudicatory hearings must be held"); *Gallagher & Ascher Co.* v. *Simon*, supra, 687 F.2d 1074 (5 U.S.C. § 558 [c] "does not itself create a right to a full adjudicatory hearing before a license may be suspended or revoked, but simply imposes separate procedural requirements in addition to those procedures that may otherwise be required under . . . the [federal Administrative Procedure Act]"); *Taylor* v. *District Engineer, United States Army Corps of Engineers*, 567 F.2d 1332, 1337 (5th Cir. 1978) ("we do not read [5 U.S.C.] § 558 as requiring a [5 U.S.C.] § 556 hearing"); *Marathon Oil Co.* v. *Environmental Protection Agency*, 564 F.2d 1253, 1260–61 n.25 (9th Cir. 1977) (5 U.S.C. § 558 [c] "does not independently provide that full adjudicatory hearings must be

held"). But cf. *Air North America* v. *Dept. of Transportation*, 937 F.2d 1427, 1437 n.9 (9th Cir. 1991) (noting existence of "split among the [federal circuit courts] as to whether [§] 558 [c]'s requirements of notice and opportunity to correct create an obligation that the agency conduct a full adjudicatory hearing"); *New York Pathological & X-Ray Laboratories, Inc.* v. *Immigration & Naturalization Service*, 523 F.2d 79, 82 (2d Cir. 1975) (stating that "the designation of approved facilities constituted a license required by law, within the reach of 5 U.S.C. § 558 [c] . . . which requires an agency to conduct proceedings in accordance with 5 U.S.C. §§ 556 and 557," which, in turn, require notice and opportunity to be heard).

In light of our conclusion that the text of § 4-182 (c) does not contain a hearing requirement, and our conclusion that this determination is consistent with procedural due process considerations pertaining to license revocations and the weight of federal authority, we next examine our previous decisions to resolve any inconsistencies with these conclusions. We conclude that, to the extent that such inconsistencies exist, they are limited to dicta[26] or are based on an incorrect interpretation of the law.

We begin with the cases in which this court has construed § 4-182 (c) to include a hearing requirement in dicta. In *Hart Twin Volvo Corp.* v. *Commissioner of*

---

[26] We previously have observed that dictum is "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination . . . [or] any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion. Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication." (Internal quotation marks omitted.) *DeSena* v. *Waterbury*, 249 Conn. 63, 78 n.16, 731 A.2d 733 (1999), quoting Black's Law Dictionary (6th Ed. 1990) p. 454.

*Motor Vehicles,* supra, 165 Conn. 42, the commissioner of motor vehicles (commissioner) temporarily suspended the license of the plaintiff, Hart Twin Volvo Corporation (Hart Twin), to operate a car dealership after giving Hart Twin notice that it had violated a state statute pertaining to the operation of car dealerships. Id., 42–43. On appeal, Hart Twin claimed that the commissioner had not provided it with sufficient notice of the charges prior to the suspension hearing and that the commissioner improperly had suspended its license on the basis of charges not contained in the notice. See id., 44. In concluding that Hart Twin had the right to fair notice and a hearing before the suspension of its license, we stated in a footnote that the requirements of due process vary depending on the nature of the case under consideration and that § 4-182 (c) distinguishes between the notice requirements for proceedings involving the issuance of licenses and proceedings involving the revocation of licenses. Id., 47 n.2. We noted that, although notice and a hearing are required in either circumstance, the notice requirements for proceedings involving revocation are stricter than those for proceedings involving the issuance of licenses.[27] See

[27] In *Hart Twin Volvo Corp.*, we specifically stated: "It should be understood that the requirements of due process are not fixed but depend on the nature of the case under consideration and the relative interests, both governmental and private, involved. . . . This principle is reflected in [UAPA] . . . . Section 4-182 of [UAPA] draws a distinction between the notice requirements of proceedings involving the issuing of licenses and of proceedings involving the taking away of licenses. Under § 4-182 (a), when the grant, denial or renewal of a license is required to be preceded by notice and a hearing, the notice . . . under [General Statutes (Rev. to 1972)] § 4-177 (b) (4) [must] contain 'a short and plain statement of the matters asserted.' Section 4-182 (c), however, requires notice *and hearing* for the revocation, suspension, annulment or withdrawal of any license, and the notice must inform the licensee 'of facts or conduct which warrant the intended action.' The stricter notice requirements for the latter type of proceeding are a function of the more compelling private interest involved; because of this interest, the demands of due process are greater than they are in the former type of proceeding." (Citations omitted; emphasis added.) *Hart Twin Volvo Corp.* v. *Commissioner of Motor Vehicles,* supra, 165 Conn. 47 n.2.

id. In *Levinson* v. *Board of Chiropractic Examiners*, supra, 211 Conn. 508, in which the plaintiff chiropractors, whose licenses had been suspended due to allegedly improper conduct, had raised similar claims regarding inadequate notice prior to their suspension hearings, we employed the language that we used in *Hart Twin Volvo Corp.* to explain the distinction between the notice requirements for the issuance and revocation of licenses. Id., 533–34.

The relevant issues in *Hart Twin Volvo Corp.* and *Levinson* involved requirements of notice rather than hearings. In those cases, we sought to emphasize the difference between the notice requirements pertaining to the issuance of a license, which mandate only "a short and plain statement of the matters asserted"; General Statutes § 4-177 (b) (4); and the notice requirements relating to the revocation of a license, which mandate "notice . . . of facts or conduct" warranting revocation of the license. General Statutes § 4-182 (c). Our references in *Hart Twin Volvo Corp.* and in *Levinson* to a hearing requirement in § 4-182 (c) thus were not essential to our recitation of that principle and may be regarded as dicta and, thus, not binding. See, e.g., *State* v. *Hafford*, 252 Conn. 274, 314 n.21, 746 A.2d 150 ("[t]he language . . . was dict[um] and is not binding on us now"), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

Similarly, in *Easter House, Inc.* v. *Dept. of Children & Youth Services*, supra, 214 Conn. 560, we stated that "[i]f the plaintiff [Easter House, Inc.] has a license to conduct the activities that the letter [of the department of children and youth services] prohibited it from engaging in . . . § 4-182 (c) entitled [Easter House, Inc.] to notice and an opportunity for a hearing prior to such a license revocation." Id., 566. In *Easter House, Inc.*, however, we determined that Easter House, Inc., never possessed a license within the meaning of General Stat-

utes § 4-166 (6), and, therefore, that the provisions of § 4-182 (c) were not applicable. Id., 572. Accordingly, our reference in *Easter House, Inc.* to a hearing requirement in § 4-182 (c) also constitutes dictum and, therefore, cannot be considered binding. See, e.g., *State* v. *Hafford*, supra, 252 Conn. 314 n.21.

In two other cases, however, namely, *Hickey* v. *Commissioner of Motor Vehicles*, supra, 170 Conn. 145 n.2, and *PARCC, Inc.* v. *Commission on Hospitals & Health Care*, supra, 235 Conn. 142, we directly construed the language of § 4-182 (c) as containing a hearing requirement. In *Hickey*, we concluded that the defendant commissioner of motor vehicles improperly had suspended the driver's license of the plaintiff, Robert B. Hickey, without a hearing for a motor vehicle violation that had occurred in another state. See *Hickey* v. *Commissioner of Motor Vehicles*, supra, 137, 144. We concluded that the suspension of Hickey's license without a hearing was in violation of Hickey's right to procedural due process and that, "[i]n Connecticut, these considerations of due process are set out in [UAPA] . . . which provides for uniform standards by which all non-exempted agency action is to be judged." (Internal quotation marks omitted.) Id., 144–45. In a footnote, we also observed: "So that § 4-182 (c) shall be consistent with [the] provisions of the state and federal constitutions and the explication of those provisions by this court and the United States Supreme Court, the 'opportunity to show compliance' *must be afforded in the form of a hearing*, complying with other provisions of . . . UAPA as may be relevant." (Emphasis added.) Id., 145 n.2.

In *PARCC, Inc.* v. *Commission on Hospitals & Health Care*, supra, 235 Conn. 142, we similarly interpreted § 4-182 (c) to require a hearing. The plaintiff, PARCC, Inc., a licensed nursing facility, appealed from the judgment of the trial court dismissing its appeal

from the decision of the defendant, the commission on hospitals and health care (commission), to deny its request for reauthorization to expand its nursing facility. Id., 129–35. We concluded that the commission's decision constituted the revocation of a license for purposes of UAPA because PARCC, Inc., was required to obtain and previously had obtained the commission's permission to proceed with the expansion. See id., 142. We concluded that "[t]he [commission], therefore, was required by . . . UAPA [specifically, § 4-182 (c)] to afford [PARCC, Inc.] notice and an opportunity for a hearing before such license was revoked." Id.

To the extent that the language in *Hickey* and *PARCC, Inc.* stands for the proposition that a hearing is required as part of the "opportunity to show compliance" provision of § 4-182 (c) or as a component of § 4-182 (c) generally, we reject that interpretation because it runs counter to the plain language of the statute. We will not import such meaning to a statute when the text of the statute is clear and unambiguous. We therefore conclude that, although § 4-182 (c) does not mandate a hearing, it does require the agency to give the licensee notice of the claimed conduct or conditions deemed by the agency to warrant potential revocation of the license as well as an opportunity to show compliance with all the legal requirements for retention of the license. If the licensee cannot show compliance and the licensing statute itself or requirements of due process mandate a hearing, the agency must give the licensee notice of a formal revocation proceeding pursuant to General Statutes § 4-177 (a), which provides that, "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice."

### III

The department and the office of consumer counsel finally claim that Tele Tech did not demonstrate that

its substantial rights were prejudiced, as required by § 4-183 (j), as a result of any procedural inadequacy stemming from the August 17, 2001 letter because the September 17, 2001 letter that the department sent to Tele Tech constituted adequate notice to Tele Tech of the facts giving rise to the proceedings and, further, the department afforded Tele Tech an opportunity to demonstrate compliance at the hearing conducted four months later, on January 15, 2002. We agree that Tele Tech has failed to sustain its burden of demonstrating that its substantial rights were prejudiced by the department's violation of § 4-182 (c).[28]

As we previously have noted in this opinion, the complaining party bears the burden of demonstrating that its substantial rights were prejudiced by the administrative agency's error. See General Statutes § 4-183 (j); *Jutkowitz* v. *Dept. of Health Services*, supra, 220 Conn. 97; *Levinson* v. *Board of Chiropractic Examiners*, supra, 211 Conn. 536. When a procedural error has occurred, but a licensee has had an opportunity to offer evidence at a hearing militating against an agency's adverse action, and has had an opportunity to show compliance "well in advance" of an agency's final determination, no such prejudice results. *Holt Hauling & Warehousing System, Inc.* v. *United States Customs Service*, 650 F. Sup. 1013, 1018–19 (Ct. Intl. Trade 1986) (no prejudice to licensee on basis of agency's violation of 5 U.S.C. § 558 [c] when licensee "submitted a response to the . . . charges . . . [and] had the opportunity to bring forth evidence at the hearing to militate against a recom-

---

[28] We note that the trial court made no finding, either in its memorandum of decision or subsequent articulation, as to whether Tele Tech had demonstrated that its substantial rights were prejudiced as a result of the department's actions. On numerous occasions during oral argument before the court, however, the court attempted to ascertain from the attorney representing Tele Tech how the department's conduct had prejudiced Tele Tech's rights. On each occasion, no explanation was offered as to how or even whether Tele Tech's rights were prejudiced.

mendation of suspension . . . [because the licensee] was afforded the opportunity to demonstrate compliance and present any mitigating evidence well in advance of the final decision" resulting in suspension).

In the present case, Tele Tech had ample opportunity at the January 15, 2002 administrative hearing to offer evidence that would demonstrate compliance or its initiative to bring itself into compliance with all the legal requirements for the retention of its certificate of public convenience and necessity, and this opportunity occurred well in advance of the department's final decision, which was rendered on May 1, 2002. Instead of conveying an eagerness to comply, however, de la Torres, who testified on behalf of Tele Tech, candidly admitted that Tele Tech's own negligence had caused the delay in requesting reinstatement of the surety bond that Utica Mutual had cancelled on the basis of Tele Tech's nonpayment of premiums. Moreover, although de la Torres represented that Tele Tech would have paid the $20,000 fine if it had known that it could pay in installments, de la Torres did not indicate that Tele Tech was willing at that time to enter into a payment plan to ensure satisfaction of the fine. Instead, de la Torres conveyed a rather bleak forecast for Tele Tech, declaring in relevant part: "It's difficult for [Tele Tech] to stay in business. We [are] planning to go out of business . . . and we [are] . . . trying to get out of state." Furthermore, in response to a question by the hearing examiner as to whether it was his "testimony [that Tele Tech] simply [did not] have the money to pay the $20,000 [fine]," de la Torres testified in the affirmative. In sum, Tele Tech submitted no evidence that would militate against the department's revocation of Tele Tech's certificate of public convenience and necessity. Furthermore, Tele Tech failed to take advantage of the lengthy time period before the agency's final decision in May, 2002, to demonstrate compliance.

Thus, although we conclude that the department violated the procedures set forth in § 4-182 (c) by failing to provide Tele Tech with a "second chance" to show compliance prior to the institution of agency proceedings on August 17, 2001, Tele Tech has not shown that this error prejudiced its substantial rights.

The judgment is reversed and the case is remanded with direction to render judgment dismissing Tele Tech's appeal.

In this opinion the other justices concurred.